## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------ X

SCOTT SIDELL,                              :     3:08CV710 (VLB)
                                           :
                   Plaintiff,              :
                                           :
v.                                         :
                                           :
STRUCTURED SETTLEMENT INVESTMENTS,         :
LP, PLAINTIFF FUNDING HOLDING, INC.        :
(D/B/A "LAWCASH"), DENNIS SHIELDS,         :
HARVEY HIRSCHFELD, RICHARD PALMA,          :
and SCOTT YUCHT,                           :
                                           :
                   Defendants.             :     July 31, 2008
                                           :
------------------------------------------------------------ -X


## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION TO DISQUALIFY COUNSEL

Defendants Structured Settlement Investments, LP ("SSI"), Plaintiff Funding

Holding, Inc., Dennis Shields, Harvey Hirschfeld, Richard Palma and Scott Yucht

respectfully submit this memorandum of law in opposition to plaintiff's motion for

disqualification.

Plaintiff Scott Sidell's motion should be denied for the following five reasons:

***First***, this issue is already pending in arbitration, before a JAMS arbitrator in New

York City, who has already presided over extensive proceedings in the nine months since

the arbitration commenced in October 2007.  For example, recently, in the arbitrator's

pre-hearing order #8, the arbitrator set a briefing schedule on a motion that is identical to

the instant motion.  The instant motion is duplicative, and subsumed in the arbitration,

ORAL ARGUMENT REQUESTED

Dockets.Justia.com

and this entire case should be sent to arbitration, for the reasons set forth in defendants' motion to compel arbitration, filed on July 23, 2008.

***Second***, Sidell's motion fails for a total lack of proof. It is based almost entirely on unverified allegations in a complaint, supplanted by unsubstantiated, erroneous, hyperbolic accusations by plaintiff's counsel, which counsel are new to the case and apparently unfamiliar with the facts of what has transpired in the arbitration to date.

***Third***, the unsworn allegations Sidell relies upon are insupportable. Sidell himself should know that they have been the subject of several lengthy telephonic hearings with the arbitrator, and that in those hearings, they have been disproven.

***Fourth***, there is no chance of a "tainted" trial – both because there will be no trial (there should be only an arbitration) and because the conduct of which Sidell complains was both harmless and justified under the circumstances.

***Fifth***, in the arbitration, Sidell's counsel intimated that they have made this motion for tactical reasons.

Defendants respectfully request that the Court (1) send this motion to the Arbitrator for decision, along with the rest of this case; or alternatively, (2) deny this motion and stay the case; or (3) stay this motion and this case pending resolution of the same issues in the arbitration.

## FACTS

On August 24, 2007, Scott Sidell was terminated by SSI for Cause. In the termination letter sent to him that same day, SSI made demand upon Sidell to repay $450,000 that he had received as an advance, under a contract that expressly required him

2

to repay it if he was terminated prior to September 2007, which he was. (Exhibit A to the Declaration of John Crossman, filed herewith, is a copy of the termination letter). Shortly after that, the company sent Sidell a series of letters demanding, among other things, that he return company property, a laptop computer and a blackberry. (Crossman Decl. at ¶ 6).

On October 12, 2007, after learning that Sidell had taken a copy of the company's database (discussed below), SSI sent Sidell a cease and desist demand letter. (Exh. B to Crossman Decl.). SSI gave Sidell two business days from receipt, until October 18, 2007, to comply. Sidell had to have known that if he failed to comply, that SSI would name him as a respondent in an arbitration. Arbitration was mandated by Sidell's employment agreement for all disputes relating to Sidell's employment. (Crossman Decl. at ¶ 6).

Sidell was not content to wait to be named as a respondent. The day of the deadline for compliance with that demand, Sidell failed to comply, and instead preemptively commenced an Arbitration in New York City under the administration of JAMS. (Crossman Decl. at ¶ 7).

Not only did Sidell jump-the-gun by filing an arbitration, he also chose to name a host of parties as respondents, even though they were not signatories to Sidell's arbitration agreement. All of those parties, which comprise substantially the same parties as here, answered, and SSI filed a counterclaim against Sidell, the same claim it would have filed as "claimant" had Sidell not rushed to JAMS first. (Crossman Decl. at ¶ 8).

3

Between the time of Sidell's termination, and the filing of SSI's counterclaim in the Arbitration, several things happened that are touched upon, albeit sometimes incompletely or erroneously, in the instant motion to disqualify. (Crossman Decl. at ¶ 9).

First, immediately after Sidell was fired, he returned -- without authorization -- to the office of SSI, and there he accessed one of SSI's corporate computers. The particular computer was not within Sidell's former workspace, and had not been assigned to him. Having been terminated, Sidell was not even authorized to be in the offices, much less using a company computer. Sidell nevertheless proceeded to enter the office, and to use that computer, and an email access program that Sidell appears to have previously installed on that computer contrary to company policy. What did he do with that computer and that program? He proceeded to steal extensive amounts of valuable, confidential data belonging to his employer, including customer lists, files, and the like. These takings are detailed in the affidavit of Rich Palma, attached to the Crossman Decl. as Exhibit C (at ¶¶ 35-36), which was filed on June 13, 2008 in the PJR action, *Scott Sidell v. Structured Settlement Investments, LP and Plaintiff Funding Holding, Inc.*, Civil Action No. 3:08 CV 717 (JBA). (Crossman Decl. at ¶ 10).

Second, an agent of SSI discovered and observed Sidell *in flagrante delecto*, while he was trespassing in the office and in the act of using this unauthorized program to illegally send to his personal email account a series of emails full of stolen data. Soon after being discovered, without explaining himself or commenting to SSI's agent, Sidell left the premises, never to return. (Crossman Decl. at ¶ 11).

Third, the SSI agent who observed Sidell in the act immediately contacted Scott Yucht, who is charged with maintaining the SSI computer systems. Yucht regularly

4

employs a remote access program on all SSI computers, and this practice is well-known to all employees, and was known to Sidell. Employing the standard remote-access program, Yucht could apparently view on the computer in question exactly what it was that Sidell had been doing. He apparently could see right into Sidell's Yahoo email account because the program that Sidell had installed on the computer provided a "window" to see straight into that account. Yucht looked, and quickly discovered the massive data theft. (Crossman Decl. at ¶ 12).

Over the next few days, Yucht remotely accessed that computer to gather up the evidence in order to be able to determine the extent of the damage, to be in position to seek appropriate remedies, and perhaps to prevent some amount of further harm. (Crossman Decl. at ¶ 13).

At the time that Yucht was engaged in this remote access of the computer and the Yahoo account, neither Mr. Crossman nor anyone at ZGB had communicated with Yucht in any fashion. Crossman had never met Yucht, and indeed never spoke to him until after he had finished his last access of the Yahoo account. No one at ZGB was consulted or gave any instructions concerning Yucht's access to the Yahoo account. (Crossman Decl. at ¶ 14).

Yucht acted on his own, consistent with his corporate responsibility, in a simple and straightforward attempt to assess the extent of damage that had been done to the corporate computer systems that he is charged with safeguarding. (Crossman Decl. at ¶ 15).

Subsequently, Yucht forwarded a collection of some emails to his superiors, and eventually that collection was delivered to ZGB. (Crossman Decl. at ¶ 16).

At the time ZGB received the emails, ZGB was not aware that Yucht had, allegedly, looked at the account on more than one day. At the time ZGB received the emails, ZGB was under the impression that all of the emails in question concerned communications of Sidell made on the day of his termination, or before that day. Months later, after the emails were produced to Sidell's then-attorneys (Mr. Corenthal and Mr. Rabin, but not anyone at the Hurwitz Sagarin firm, which had not yet been retained), at a hearing before JAMS Arbitrator Jeanne Miller, Sidell's then-attorneys asserted for the first time that some of the emails were prepared by Sidell after he was terminated, on a subsequent day. As Arbitrator Miller will certainly recall, this came as a surprise to Crossman, who was on the call. (Crossman Decl. at ¶ 17).

In any case, when ZGB received the emails, ZGB discovered that some of them were between Mr. Rabin and Mr. Sidell. As soon as that was discovered, Crossman ordered that all emails between Mr. Sidell and an attorney be quarantined (the "Attorney Emails"), so that no one would review them, in order for ZGB to figure out what was the proper course of action. A copy of the label from the file indicating the quarantine status, is annexed to the Crossman Decl. as Exh. D. (Crossman Decl. at ¶ 18).

At that time, when ZGB had first discovered that some attorney communications were included, there was no reason to believe that any of the Attorney Emails were "misdirected" or sent in error. Even today, there is no reason to think that any were misdirected. Rather, at the time that ZGB was dealing with the Attorney Emails, it appeared that the emails had been sent, deliberately, from a company computer, in violation of company email policy, on a computer not even assigned to Sidell, and left open and viewable by anyone in the SSI offices. It was apparent that based upon these

6

facts, there was no reasonable expectation of privacy. The question as ZGB understood it therefore was: Do communications prepared and sent in this fashion constitute privileged communications, or are they non-privileged because, for example, they were sent under circumstances that evidence a deliberate waiver of privilege. (Crossman Decl. at ¶ 19).

The Attorney Emails were kept under quarantine while ZGB researched the answer to this question. (Crossman Decl. at ¶ 20).

ZGB determined that there was a corporate email policy, and that Sidell had a copy of it. The policy which is attached as Exhibit E, reads in pertinent part:

### E-Mail and Internet Usage

Use of e-mail and the Internet is reserved solely for the conduct of Company business. It may not be used for personal business.

(Exh. E to Crosman Decl. at 17).

### E-Mail and Internet Policy

Company equipment (such as the computer system, e-mail and access to the Internet) is to be used for business purposes only. To ensure that all employees are using Company e-mail and the Internet in a responsible manner, the following policies have been established:

♦   Use of the Company's computer system (including e-mail and the Internet) is reserved solely for the conduct of Company business. It may not be used for personal business.

♦   The e-mail system is Company property. All messages composed, sent, or received on this system are and remain the property of the Company. They are not the private property of any employee and may be disclosed within the Company without the permission of the employee who composed or received them.

♦   The Company reserves and intends to exercise the right to review, audit, intercept, access, and disclose all messages created, received, or sent over the e-mail and Internet systems for any purposes. By using the Company's e-mail and Internet systems, the employee recognizes the rights of the Company and consents to them.

7

...

&#9670;     The confidentiality of any message should not be assumed. Even when a message is erased, it is still possible to retrieve and read it.

(Exhibit E to Crossman Decl. at 26-27). (Crossman Decl. at ¶ 21).

ZGB's pre-review research disclosed that where, as here, there is a corporate email policy like the one at SSI, an employee cannot claim that such emails are privileged. Before reviewing the emails, ZGB relied for this conclusion upon *Scott v. Beth Israel Medical Center, Inc.*, 847 N.Y.S.2d 436 (N.Y. Sup. Oct 2007); and *In Re Asia Global Crossing, Ltd.*, 322 B.R. 247 (2005). (Crossman Decl. at ¶ 22).

It is important to remember that at this point in time, and for some months after, ZGB was unaware of there being any emails in the Attorney Email collection that were prepared after Sidell's last visit to the office. At the time, ZGB did not know that it was even possible for there to be emails from after that date in the collection. Because ZGB had no knowledge of such "post termination date" emails being included, ZGB in good faith did not consider or think to consider such an unexpected possibility. (Crossman Decl. at ¶ 23).

Having concluded that these communications were not "misdirected," ZGB was not required to follow any of the "inadvertent production" or "misdelivery" procedures relied upon by Sidell in his disqualification memorandum. ZGB was dealing with something entirely different: emails prepared under circumstances where an employee had no right to claim a privilege. (Crossman Decl. at ¶ 24).

Under such circumstances, ZGB's duty of zealous representation, in Mr. Crossman's judgment, required ZGB to review the Attorney Emails because they were

clearly nonprivileged under applicable law. They were fair game, just like any other communication not made privately. (Crossman Decl. at ¶ 25).

Having determined that cases recognize that there is no privilege under the circumstances present here, ZGB removed the quarantine and Crossman reviewed the Attorney Emails in the collection that were between Sidell and Rabin. To Crossman's present recollection, there were no emails with Mr. Corenthal. (Crossman has not re-reviewed the emails since they have been returned to Sidell's counsel months ago, although they are attached to papers presently filed *by Sidell* in the arbitration.) Although Crossman has no knowledge of whether Mr. Sidell was communicating with Mr. Corenthal by email at the time in question, Mr. Crossman does not believe that any emails from him were included in the collection ZGB received. Mr. Crossman is confident that he never heard Mr. Corenthal's name until months later, when Mr. Rabin's firm was getting ready to withdraw from the representation of Sidell, and he was informed by Rabin that Corenthal's firm was about to take over. (Crossman Decl. at ¶ 26).

Mr. Crossman does not recall anything of interest (or indeed anything at all) in the collection of Attorney Emails, except for the discovery that Sidell had secretly tape-recorded his termination meeting. Crossman is confident that he learned nothing of any importance in the case other than of the existence of this tape, which had been concealed from our client. (Crossman Decl. at ¶ 27).

On January 18, 2008, as part of the general production of requested documents, the Attorney Emails were then produced to Sidell's attorney, along with other emails, not sent to an attorney, which were the emails in which, immediately after his termination,

Sidell stole massive amounts of highly valuable company data. (Crossman Decl. at ¶ 28). As has already been made clear in the arbitration, counsel did not "redact" anything from the emails.

ZGB had sought to produce these materials in advance of January 18, but ZGB could not do so because Sidell's counsel was slow to agree to a protective order. In fact, after weeks of discussions, Sidell eventually refused to agree to the proposed confidentiality agreement, so that the arbitrator herself had to enter a protective order, which she did on January 18. The document production followed immediately.

It is important to understand that as part of this document production, ZGB was producing copies of the same emails in which Sidell illegally sent himself our client's customer lists, and other things, and it was critical that ZGB not give them these sensitive documents "in the clear" without obligation of confidentiality. (Crossman Decl. at ¶ 29).

After the emails were produced, Sidell's then-attorney raised concerns about the Attorney Emails with the arbitrator. In February 2008, at a conference call, Mr. Crossman learned for the first time of the existence of post-termination-date emails among the Attorney Emails. As soon as Crossman discovered the existence of such emails in the mix, he immediately agreed to return *all* copies of those emails to Sidell's attorney, and to delete any electronic copies so that there would be no danger of access to them. This ZGB promptly did. (Crossman Decl. at ¶ 30).

That should have been the end of the matter, but Sidell has proven to be intent on making the largest possible issue about this. He has, accordingly, raised it with the arbitrator, and the entire issue is the subject of pending cross-motions for sanctions in the Arbitration. SSI seeks to Sanction Sidell for violating the protective order by

intentionally using the emails and other discovery materials outside of the Arbitration, and Sidell seeks to sanction SSI and the ZGB law firm, for the identical things raised in this motion. A copy of Sidell's motion in the arbitration is attached as to the Crossman Declaration as Exh. F. (Crossman Decl. at ¶ 31).

This duplication of effort points out a fundamental problem with this motion: With all due respect, this motion should be decided, if at all, by Arbitrator Miller, and not by this Court. (Crossman Decl. at ¶ 33). The instant dispute is among the disputes that are subject to mandatory arbitration -- on July 23 defendants filed a motion to compel arbitration of this action, and the instant motion to disqualify ought not be decided by this Court at all, but instead should be decided (if not first withdrawn) by Arbitrator Miller, who is already in possession of the same motion in the arbitration. The conduct complained of arises 100% from the conduct of the Arbitration, and much of that conduct was personally and directly supervised by Arbitrator Miller. Not only that, the filing of this action was itself a violation of the Arbitrator's Protective Order. Additionally, the entire subject of this action concerns Sidell's employment and termination and his illegal conduct immediately following his termination, all of which is covered by Sidell's employment agreement and its mandatory arbitration clause. (Crossman Decl. at ¶ 34).

## LEGAL ARGUMENT

### I.

## THE ARBITRATOR HAS JURISDICTION OVER THIS MATTER

For the reasons set forth in our motion to compel arbitration, filed on July 23, 2008, this motion should be transferred to the pending arbitration under the administration of JAMS arbitration, JAMS case number 1425000992, Arbitrator Jeanne C. Miller, presiding.

### II.

## SIDELL HAS FAILED TO MEET THE HIGH STANDARD OF PROOF REQUIRED TO DISQUALIFY OPPOSING COUNSEL

The moving party bears "the heavy burden of proving facts required for disqualification." *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2d Cir.1983). The burden lies on the party arguing for disqualification "to demonstrate that continued representation by the challenged attorney would result in serious prejudice." *Shabbir v. Pakistan Int'l Airlines*, 443 F.Supp.2d 299, 305 (E.D.N.Y. 2005). "[A] district court must consider the factual record underlying such a motion in detail to determine whether the party seeking disqualification has sustained the high standard of proof necessary to disqualify opposing counsel." *Papyrus Technology Corp.*, *supra*, 325 F.Supp.2d at 276. "Vague and unsupported allegations are not sufficient to meet this standard." *Cohen v. Oasin*, 844 F.Supp. 1065, 1067 (E.D.Pa.1994); *accord Shabbir v. Pakistan Int'l Airlines*, 443 F.Supp.2d 299, 312 (E.D.N.Y. 2005)("Thus, at this point, in the absence of any evidence supporting plaintiff's claims of misconduct, apart from plaintiff's unsworn

statements in these papers, the Court finds these allegations of impropriety to be an insufficient basis on which to order counsel's disqualification.").

Sidell's motion is premised upon sheer speculation. In his statement of facts, Sidell cites to unverified allegations in his Complaint, most of which Sidell alleges are based "upon information and belief." (Complaint at ¶¶ 22, 29, 30, 31, 32, 33, 35, 36, 37, 38, 42). Then, Sidell waters down his allegations even further. He states they are based merely upon what "appears" (plaintiff's memorandum of law ("Mem.") at 2, 10, 17), what "apparently" happened (p. 2), what "possibly" happened (p. 18), his beliefs" (p. 17), and what he thinks there is "reason to believe" (p. 17).

The *only* purported evidence submitted by Sidell is contained in the declaration that Sidell culled from the file in the JAMS arbitration. That is the affidavit by Richard Corenthal, Esq., Sidell's second in a series of three attorneys (and law firms) in the arbitration. Sidell filed this same affidavit in connection with the cross-motions for sanctions pending in arbitration. (Exh. A to Mem.). It contains seven paragraphs. The first is introductory. The second and fourth, which are based upon "information and belief," merely speculate about Sidell's retention of his first lawyer, Rabin, and what Rabin did. The third paragraph is inconsequential, concerning the absence of communications between Corenthal and defense counsel before Corenthal became involved in the arbitration. The fifth and sixth paragraphs contain improper attorney argument and hearsay (*e.g.*, "our review of Respondents' documents production indicated that Respondents accessed and opened Dr. Sidell's private emails from his personal email account without authorization). Furthermore, they contain hearsay statements about the contents of emails which are not even before this Court. (*i.e.*, "These attorney-client

13

communications concerned Dr. Sidell's claims, defenses, retention of counsel and advice by Dr. Sidell's counsel.").[1] Moreover, it refers to documents produced in arbitration subject to the restrictions contained in the arbitrator's protective order. Sidell's disclosure here constitutes a further violation of that protective order.[2]

Stripped to its core, the Corenthal affidavit presents a single assertion: that defense counsel did not notify Corenthal that his clients' possessed the emails until they produced them to Corenthal in January 2008. (Exh. A to Mem., at ¶ 7). This course of action was a violation of nothing.

As Sidell recognizes, this is not a case in which an email was "misdirected." As a result, the opinion cited at p. 15 of Sidell's brief does not apply. Thus, the simple question is whether or not ZGB would be expected to conclude that any privilege could attach to communications where, as ZGB understood the facts, Sidell – himself then a trespasser – had created the emails and left them available for anyone to see on an unassigned company computer in the workplace, as part of a massive data theft accomplished at the same time. As set forth in the Declaration of John Crossman, once ZGB learned that there were attorney emails included in the mix, ZGB prudently

---

[1]  At the arbitrator's direction, all of the Attorney Emails have been returned to Sidell's counsel. However, by attaching the emails to his arbitration filings, Sidell injected the emails right back into the arbitration proceeding, so that *any* lawyer representing the respondents in the arbitration proceeding will have to see them.

[2]  On June 13, 2008, the arbitrator issued an order authorizing respondents to file a motion for sanctions for Sidell's violation of the arbitrator's protective order. Sidell then warned that if respondents were going to seek sanctions, he would in turn seek sanctions and to disqualify counsel – thereby demonstrating that this motion is being made for tactical reasons. (A copy of the Hurwitz Sagarin firm's June 19, 2008 letter to Arbitrator Miller is attached to the Crossman Dec. as Exh. G). A month later, on July 15, Sidell sought to employ "the best defense is a good offense" strategy by filing the present motion.

quarantined the documents pending research and analysis about whether Sidell had any expectation of privacy in emails visible to anyone in the workplace who sat at the computer. The emails were not reviewed until counsel was satisfied that Sidell had no expectation of privacy, given the company's policy and the fact that Sidell knew that company computers were monitored. (Crossman Decl. at ¶¶ 12, 21, 22). Consistent with applicable law, counsel reasonably concluded they were not privileged, and produced them along with the other documents, including the documents showing that Sidell had stolen confidential company information through use of his Yahoo email account.

Our research has uncovered no cases in which an attorney was disqualified based on unverified allegations in a complaint, or unsupported charges in a brief written by a lawyer who was not even involved in the matters under discussion. Based upon the present record, it would be reversible, immediately appealable, error for this Court to disqualify ZGB.

### III.

### THERE IS NO ETHICAL VIOLATION
### THAT THREATENS TO TAINT TRIAL

A.  There Is A High Burden, In Part Because These Motions Are Tactical

The Second Circuit has repeatedly held that disqualification motions are disfavored and require a high standard of proof.

> [W]e have also noted that 'there is a particularly trenchant reason for requiring a high standard of proof on the part of one who seeks to disqualify his former counsel, for in disqualification matters we must be solicitous of a client's right freely to choose his counsel - a right which of course must be balanced against the need to maintain the highest standards of the profession.'

*Evans*, *supra*, 715 F.2d at 791-792, citing *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir.1978).

Courts in the Second Circuit have frequently observed that motions to disqualify are increasingly filed for tactical reasons. *Rodriguez v City of New Haven*, 214 F.R.D. 66, 68 (D. Conn. 2003)("The Second Circuit, however, disfavors motions to disqualify because of the potentially adverse effect on a client's right to engage counsel of his or her choosing, and because such motions are often made for tactical reasons."); *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)("This reluctance [to disqualify] probably derives from the fact that disqualification has an immediate adverse effect on the client by separating him from counsel of his choice, and that disqualification motions are often interposed for tactical reasons.").

## B. There Is Evidence That This Motion Is Tactical

There is evidence that the instant motion was indeed filed for tactical reasons. First, Sidell's present counsel as much as said so. Hurwitz Sagarin letter to Arbitrator dated June 19, 2008, Exh. G to Crossman Decl., at 1 ("This letter follows our telephone status conference of Friday, June 13, 2008 in which [SSI] requested, and you granted, permission to file a motion for sanctions...[SSI's] intent to file for sanctions leaves us no alternative. Now that the issue of sanctions has been raised and will be briefed, we also request permission to file sanctions [sic] and propose doing so pursuant to the same schedule set forth in Order #7."). Second, since filing this motion, Sidell's counsel has repeatedly represented to this Court that there is no particular need for Mr. Crossman or the ZGB firm to participate in this case because ZGB has local counsel, Mr. Peloso of Robinson Cole. (Sidell's Motion for Adoption of Rule 26(f) Report at ¶¶ 5, 6; Sidell's

Objection to Defendants' Motion to Compel Rule 26(f) Conference at ¶¶ 5, 6). However, as Sidell's counsel knows, Robinson Cole has had no involvement in the eight-month course of the arbitration, knows nothing of the events detailed in the complaint in this action, and has been recently retained solely to reduce the inconvenience of Sidell having suddenly opened a second "front" to this litigation in Connecticut. It is, accordingly, apparent that it is quite intentionally Sidell's purpose to try to strip the defendants of counsel who knows the extensive history and record of this dispute, and replace them with someone who is even less familiar with the facts than Sidell's newest attorneys. Given that Sidell is the true defendant in this dispute, and that he owes hundreds of thousands of dollars that he refuses to repay, and that he was caught red-handed stealing valuable information, it is small wonder that he might try to delay, complicate and hamstring the case of the defendants. But this is precisely the kind of tactical ploy that the Second Circuit has warned against. It should not be allowed to occur here.

C.      There Was No Ethical Violation

"[T]he Second Circuit has directed that courts faced with disqualification motions take a 'restrained approach that focuses primarily on preserving the integrity of the trial process.'" *Papyrus Technology Corp. v. New York Stock Exchange, Inc.*, 325 F.Supp.2d 270, 276 (S.D.N.Y. 2004), citing *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir. 1980), *vacated on other grounds and remanded*, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981).

It is well-settled that disqualification cannot be ordered unless an actual ethical violation threatens to taint the trial. *Vincent v. Essent Healthcare of Connecticut*, 465 F.Supp. 2d 142, 145 (D. Conn. 2006)("Recognizing the serious impact of attorney

disqualification on the client's right to select counsel of his choice, we have indicated that
such relief should ordinarily be granted only when a violation of the Canons of the Code
of Professional Responsibility poses a significant risk of trial taint.")(citations omitted).

Where, as here, there is a corporate email policy like the one at SSI, an employee
cannot claim that such emails are privileged. *Scott v. Beth Israel Medical Center, Inc.*
847 N.Y.S.2d 436 (N.Y. Sup. Oct 2007); *In Re Asia Global Crossing, Ltd.*, 322 B.R. 247
(2005). *In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (2005) addressed the issue of
whether an employee had waived a privilege by sending emails to his attorney over the
company's system. The court outlined a test for employees' expectation of privacy in
computer files and email: (1) whether the company has an email policy banning personal
use, (2) whether the company monitors employees' computer use, (3) whether third
parties have right of access, and (4) whether the company notified the employee or the
employee was aware of the use and monitoring policies. The court did not reach a ruling,
finding that it needed development of the record on whether the company had a policy
against personal use of the email system or had a policy of monitoring employee email.
In such instances, there would be no privilege.

Under the *Asia Global Crossing* guidelines, the court found there to be no
privilege in *Scott v. Beth Israel Medical Center, Inc.* There, defense counsel discovered
they were in possession of email between plaintiff and his counsel. Defense counsel
contended that any privilege was waived because the plaintiff sent the emails over
defendants' email system. The Court agreed, and held that the plaintiff had waived the
privilege. The Court emphasized that the employer had an email policy, of which the
plaintiff had actual or constructive notice. The Court concluded that the privilege was

waived because, among other things, the corporate email policy bans personal use, the company monitors employee's use of the computer and email, third parties have a right of access to the computer or emails, and the company notifies the employee, or the employee is aware, of the use and monitoring policies.

Even in *Galison v. Greenberg*, 2004 WL 2848123 (New York 2004) -- the only case on this issue that Sidell attached to his brief -- the New York Supreme Court refused to disqualify counsel and denied the sanctions motion. See *Galison v. Greenberg*, Exhibit D to Sidell's brief, at p. 3 (copy attached). Moreover, unlike *Gallison*, the present case is not an instance of a "misdirected" communication.

Here, as in *Scott*, Sidell had no reasonable expectation of privacy. The only illegal conduct was by Sidell, who used his Yahoo account to steal the company's database.

It is no argument for Sidell to claim as grounds for disqualification that some emails were created after Sidell left SSI, because it is indisputable that ZGB did not even know that at the time of the actions, and the cases and ethical rules cited by Sidell all recognize that there is no ethical duty to do anything with a privileged communication until the recipient ***actually knows or should know*** that it is in possession of one. *Galison v. Greenberg*, *supra*, 2004 WL 2848123 at * 2 (citing ethics opinions). And the record in the arbitration is absolutely clear that as soon as the arguably privileged status of some of the attorney emails was known to ZGB, those emails were immediately returned to Sidell's counsel, and no copies were retained. Nothing more is required, and indeed, nothing more was even possible.

## D.    Defense Counsel Is Not A Necessary Witnesses

"There is a dual test for necessity.  First, the proposed testimony must be relevant and material.  Second, it must be unobtainable elsewhere.  Testimony may be relevant and even highly useful but still not strictly necessary." *Desarbo & Reichert, P.C. v. Cardow*, 16 Conn. L. Rptr. 386, 1996 WL 166431 at * 1 (1996)(copy attached)(internal citations omitted).

It is difficult to discern from Sidell's motion how ZGB testimony could be relevant or material.  Sidell states that the expected testimony concerns "counsel's access to and use of Sidell's emails." (Mem. at 11).  Sidell says testimony can include how the emails were acquired, when attorneys knew emails were accessed, whether attorneys were involved in accessing them, and what attorneys did with them.  (Mem. at 10). However, as Sidell knows, this has all been subject of pre-hearing discovery and orders in the JAMS arbitration.  Whether because he is unhappy with the way the JAMS arbitration is unfolding, or because it serves his interest to foment delay, Sidell is forum shopping by trying again here.  Moreover, all of this information is addressed in the accompanying Crossman Declaration.  Sidell claims -- without any explanation whatsoever -- that this testimony "directly affects the damages to which Sidell may be entitled".  (Mem. at 12). This statement is devoid of content; it explains nothing.  As for Sidell's assertion that it "may implicate the attorneys as defendants" (Mem. at 12), the apparent desire to mount a fishing expedition – or at least to threaten to do so – is not a valid basis for discovery or for the extreme remedy of disqualification.

Even if the sought testimony was relevant and material -- and it is not – such testimony is most certainly available elsewhere.  In fact, competent testimony on the

issues raised could only be obtained elsewhere. The Crossman Declaration demonstrates that there was no first-hand attorney involvement in any of the acts about which Sidell complains. (Crossman Decl. at ¶¶ 14, 17). *Desarbo & Reichert, supra*, 1996 WL 166431 at * 2 (1996)(denying motion where moving party "has not provided with any proof..."); *D'Angelo v. Schiraldi*, 2003 WL 23177472 (Conn. Super. 2003)(copy attached)("[f]rom a review of the facts presented in this case the court finds that plaintiff does not meet the second prong of the test for necessity, inasmuch as the testimony which the plaintiff is seeking is obtainable from someone other than [the] attorney.").

Under theses circumstances, the attorneys are not necessary witnesses. From discovery in the arbitration, Sidell already knows that the attorneys have no first hand knowledge.

E.     Defendants' Choice Of Counsel Should Not Be Disturbed

It is hornbook law that a party's choice of counsel will not lightly be disturbed. *Enzo Biochem, Inc. v. Applera Corp.*, 468 F.Supp. 2d 359, 364 (D. Conn. 2007). A client should not be deprived from his chosen counsel where disqualification would cause substantial hardship. In disqualification matters, courts "must be solicitous of a client's right freely to choose his counsel...mindful of the fact that a client whose attorney is disqualified may suffer loss of time and money in finding new counsel and may lose the benefit of its longtime counsel's specialized knowledge of its operations." *Matlis v. Probate Appeal*, 2004 WL 2896616, at * 1 (Conn. Super 2004)(copy attached)(internal citations omitted); *Whitney v. Capullo*, 1995 WL 459263 (Conn. Super 1995)(copy attached)(disqualification would cause a substantial hardship where attorneys had relationship with client and it was "entirely probable" that attorney's testimony would be

21

unnecessarily duplicative). ZGB has a long-standing relationship with this client; ZGB

has been involved with the Sidell matter since Sidell's termination for cause, and ZGB

has defended respondents and prosecuted the counterclaims in the arbitration from the

outset.

## **CONCLUSION**

For all the foregoing reasons, defendants respectfully request that the Court

(1) send this motion to the Arbitrator for decision, along with the rest of this case; or

alternatively, (2) deny this motion; or (3) stay it pending resolution of the same issue

before the Arbitrator.

Respectfully submitted,

DEFENDANTS

By: /s/ John K. Crossman
John K. Crossman (ct25518)
ZUKERMAN GORE & BRANDEIS, LLP
875 Third Avenue
New York, New York 10022
Telephone: (212) 223-6700
Email: jcrossman@zgbllp.com

ROBINSON & COLE LLP
John F.X. Peloso, Jr. (ct02447)
Alexander D. Pencu (ct26759)
695 East Main Street
P.O. Box 10305
Stamford, Connecticut 06904-2305
Telephone: (203) 462-7500
Facsimile: (203) 462-7599
Email: jpeloso@rc.com
Email: apencu@rc.com

## CERTIFICATE OF SERVICE

I hereby certify that, on July 31, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access the foregoing through the Court's system.

/s/ John K. Crossman
John K. Crossman (ct25518)