UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------------ X
                                                             :
SCOTT SIDELL,                                                :    3:08CV710 (VLB)
                                                             :
                        Plaintiff,                           :
                                                             :
v.                                                           :
                                                             :
STRUCTURED SETTLEMENT INVESTMENTS,                           :
LP, PLAINTIFF FUNDING HOLDING, INC.                          :
(D/B/A "LAWCASH"), DENNIS SHIELDS,                           :
HARVEY HIRSCHFELD, RICHARD PALMA,                            :
and SCOTT YUCHT,                                             :
                                                             :
                        Defendants.                          :    July 31, 2008
                                                             :
------------------------------------------------------------ X

**DECLARATION OF JOHN K. CROSSMAN IN OPPOSITION
TO SCOTT SIDELL'S MOTION TO DISQUALIFY**

I, John K. Crossman, declare and state under 28 U.S.C. § 1746 as follows:

1.      I am a member of Zukerman Gore & Brandeis, LLP, ("ZGB"), which is counsel to Structured Settlement Investments, LP, Plaintiff Funding Holding, Inc., Dennis Shields, Harvey Hirschfeld, Richard Palma and Scott Yucht (collectively Defendants). I am chair of my firm's litigation department, and am in charge of this matter, as well as the Arbitration currently pending between substantially the same parties and Scott Sidell, and also the PJR complaint seeking dueling prejudgment remedies in connection with the arbitration, which complaint is pending elsewhere in this District. I make this affidavit upon my own personal knowledge except as to matters averred upon information and belief, and as to those, I believe them to be true.

2. I have practiced civil litigation for over twenty (20) years. I am a member of the bars of the States of Connecticut (since 1987) and New York, as well as the District of Connecticut and approximately a dozen other courts across the country. I have an AV rating conferred by Martindale Hubble, and I have never been sanctioned or disqualified in any proceeding of any kind.

3. I was saddened to read the memorandum of law and motion to disqualify me and my firm, not only because counsel for Mr. Sidell never made any real attempt to gather his facts before proceeding with this insupportable attack, but because the papers are filled with unproven (and, it should be said, unprovable) *ad hominem* attacks on me, including implicit assertions of criminal and/or fraudulent conduct, deliberate concealment, and unethical behavior. It saddens me that a fellow member of the bar would so eagerly make such charges, even admitting that these charges are based upon things that, we are assured, "there is good reason to believe" (plaintiff's memorandum of law ("Mem.") at 17) or that will, supposedly, be explained "depending on information obtained during discovery" in this action. (Mem. at 13). We are told that this motion concerns "ongoing criminal or fraudulent conduct" (Mem. at 11-12), but we are never told what the crime or fraud supposedly is, much less what the evidence is.

4. Because, for the reasons I will detail in this affidavit, none of these charges holds any merit, I would have hoped that counsel would not have been so cavalier as to put such a document in the public record without possession of hard evidence.

5. But instead, Mr. Sidell on this motion is proceeding upon a barge-full of suppositions, and most of them appear, without supporting authority, in Sidell's

2

memorandum – which was submitted, it bears noting, by a lawyer who was not even involved in these matters at the time they occurred.

6. On August 24, 2007, Scott Sidell was terminated by SSI for Cause. In the August 24, 2007 termination letter, we made demand upon Sidell to repay $450,000 that he had received as an advance, to be repaid if he was terminated prior to September 2007, which he was. (Exhibit A to this affidavit is a copy of the termination letter). Shortly thereafter, we sent Sidell a series of letters demanding, among other things, that he return company property, a laptop computer and a blackberry. On October 12, 2007, after learning that Sidell had taken a copy of the company's database, we sent Sidell a cease and desist demand letter. (Exhibit B to this affidavit is a copy of that demand). We gave Sidell two business days from receipt, until October 18, 2007, to comply. Sidell had to have known that if he failed to comply, that SSI would name him as a respondent in an arbitration. Arbitration was mandated by Sidell's employment agreement for all disputes relating to Sidell's employment.

7. Sidell was not content to wait to be named as a respondent. The day of the deadline for compliance with that demand, Sidell failed to comply, and instead preemptively commenced an Arbitration in New York City under the administration of JAMS.

8. Not only did Sidell jump-the-gun by filing an arbitration, he also chose to name a host of parties as respondents, even though they were not signatories to Sidell's arbitration agreement. All of those parties, which comprise substantially the same parties as here, answered, and SSI filed a counterclaim against Sidell, the same claim it would have filed as "claimant" had Sidell not rushed to JAMS first.

9. Between the time of Sidell's termination, and the filing of SSI's counterclaim in the Arbitration, several things happened that are touched upon, albeit sometimes incompletely or erroneously, in the instant motion to disqualify.

10. First, I am informed and believe that immediately after Sidell was fired, he returned – without authorization – to the office of SSI, and there he accessed one of SSI's corporate computers. I understand that the particular computer was not within Sidell's former workspace, and had not been assigned to him. Having been terminated, Sidell was not even authorized to be in the offices, much less using a company computer. Sidell nevertheless proceeded to enter the office, and to use that computer, and an email access program that Sidell appears to have previously installed on that computer contrary to company policy. What did he do with that computer and that program? He proceeded to steal extensive amounts of valuable, confidential data belonging to his employer, including customer lists, files, and the like. These takings are detailed in the affidavit of Rich Palma, attached as Exhibit C (at ¶¶ 35-36), which was filed on June 13, 2008 in the PJR action, *Scott Sidell v. Structured Settlement Investments, LP and Plaintiff Funding Holding, Inc.*, Civil Action No. 3:08 CV 717 (JBA).

11. Second, I am informed that an agent of SSI discovered and observed Sidell *in flagrante delecto*, while he was trespassing in the office and in the act of using this unauthorized program to illegally send to his personal email account a series of emails full of stolen data. Soon after being discovered, Sidell left the premises, never to return.

12. Third, I am informed that the SSI agent who observed Sidell in the act immediately contacted Scott Yucht, who is charged with maintaining the SSI computer

4

systems. Yucht regularly employs a remote access program on all SSI computers, and I understand that this practice is well-known to all employees, and was known to Sidell. Employing the standard remote-access program, Yucht could apparently view on the computer in question exactly what it was that Sidell had been doing. He apparently could see right into Sidell's Yahoo email account because the program that Sidell had installed on the computer provided a "window" to see straight into that account. Yucht looked, and quickly discovered the massive data theft.

13. I am now informed that over the next few days, Yucht remotely accessed that computer to gather up the evidence in order to be able to determine the extent of the damage, to be in position to seek appropriate remedies, and perhaps to prevent some amount of further harm.

14. At the time that Yucht was engaged in this remote access of the computer and the Yahoo account, neither I nor anyone at my firm had communicated with Yucht in any fashion. I have never met Yucht, and indeed had never spoken to him until after he had finished his last access of the Yahoo account. No one at my firm was consulted or gave any instructions concerning Yucht's access to the Yahoo account.

15. I am informed that Yucht acted on his own, consistent with his corporate responsibility, in a simple and straightforward attempt to assess the extent of damage that had been done to the corporate computer systems that he is charged with safeguarding.

16. Subsequently, Yucht forwarded a collection of some emails to his superiors, and eventually that collection was delivered to my office.

17. At the time we received the emails, my office was not aware that Yucht had, allegedly, looked at the account on more than one day. At the time we received the

emails, we were under the impression that all of the emails in question concerned communications of Sidell made on the day of his termination, or before that day. Months later, after the emails were produced to Sidell's then-attorneys (Mr. Corenthal and Mr. Rabin, but not anyone at the Hurwitz Sagarin firm, which had not yet been retained), at a hearing before JAMS Arbitrator Jeanne Miller, Sidell's then-attorneys asserted for the first time that some of the emails were prepared by Sidell after he was terminated, on a subsequent day. As Arbitrator Miller will certainly recall, this came as a surprise to me.

18. In any case, when we received the emails, we discovered that some of them were between Mr. Rabin and Mr. Sidell. As soon as that was discovered, I ordered that all emails between Mr. Sidell and an attorney be quarantined (the "Attorney Emails"), so that no one would review them, in order for us to figure out what was the proper course of action. A copy of the label from the file indicating the quarantine status, is annexed to this affidavit as Exhibit D.

19. At that time, when we had first discovered that some attorney communications were included, there was no reason to believe that any of the Attorney Emails were "misdirected" or sent in error. Even today, there is no reason to think that any were misdirected. Rather, at the time that we were dealing with the Attorney Emails, it appeared that the emails had been sent, deliberately, from a company computer, in violation of company email policy, on a computer not even assigned to Sidell, and left open and viewable by anyone in the SSI offices. It was apparent to me that based upon these facts, there was no reasonable expectation of privacy. The question as I understood it therefore was: Do communications prepared and sent in this fashion constitute

privileged communications, or are they non-privileged because, for example, they were sent under circumstances that evidence a deliberate waiver of privilege.

20. The Attorney Emails were kept under quarantine while we researched the answer to this question.

21. We determined that there was a corporate email policy, and that Sidell had a copy of it. The policy which is attached as Exhibit E, reads in pertinent part:

> **E-Mail and Internet Usage**
>
> Use of e-mail and the Internet is reserved solely for the conduct of Company business.

(See Exh. E at p. 17).

> **E-Mail and Internet Policy**
>
> Company equipment (such as the computer system, e-mail and access to the Internet) is to be used for business purposes only. To ensure that all employees are using Company e-mail and the Internet in a responsible manner, the following policies have been established:
>
> ♦ Use of the Company's computer system (including e-mail and the Internet) is reserved solely for the conduct of Company business. It may not be used for personal business.
>
> ♦ The e-mail system is Company property. All messages composed, sent, or received on this system are and remain the property of the Company. They are not the private property of any employee and may be disclosed within the Company without the permission of the employee who composed or received them.
>
> ♦ The Company reserves and intends to exercise the right to review, audit, intercept, access, and disclose all messages created, received, or sent over the e-mail and Internet systems for any purposes. By using the Company's e-mail and Internet systems, the employee recognizes the rights of the Company and consents to them.
> ...
>
> ♦ The confidentiality of any message should not be assumed. Even when a message is erased, it is still possible to retrieve and read it.

7

(See Exhibit E at pp. 26-27).

22. Our pre-review research disclosed that where, as here, there is a corporate email policy like the one at SSI, an employee cannot claim that such emails are privileged. Before reviewing the emails, I relied for this conclusion upon *Scott v. Beth Israel Medical Center, Inc.* 2007 WL 3054451 (N.Y. Sup. Oct 2007) and *In Re Asia Global Crossing, Ltd.*, 322 B.R. 247 (2005).

23. It is important to remember that at this point in time, and for some months after, we were unaware of there being any emails in the Attorney Email collection that were prepared after Sidell's last visit to the office. At the time, we did not know that it was even possible for there to be emails from after that date in the collection. Because we had no knowledge of such "post termination date" emails being included, we in good faith did not consider or think to consider such an unexpected possibility.

24. Having concluded that these communications were not "misdirected," we were not required to follow any of the "inadvertent production" or "misdelivery" procedures relied upon by Sidell in his disqualification memorandum. We were dealing with something entirely different: emails prepared under circumstances where an employee had no right to claim a privilege.

25. Under such circumstances, our duty of zealous representation, in my judgment, required us to review the Attorney Emails because they were clearly nonprivileged under applicable law. They were fair game, just like any other communication not made privately.

26. Having determined that cases recognize that there is no privilege under the circumstances present here, we removed the quarantine and I reviewed the Attorney

8

Emails in the collection that were between Sidell and Rabin. To my present recollection, there were no emails with Mr. Corenthal. (I have not reviewed the emails since they have been returned to Sidell's counsel months ago, although they are attached to papers presently filed by Sidell in the arbitration). Although I have no knowledge of whether Mr. Sidell was communicating with Mr. Corenthal by email at the time in question, I do not believe that any emails from him were included in the collection we received. I am confident that I never heard Mr. Corenthal's name until months later, when Mr. Rabin's firm was getting ready to withdraw from the representation of Sidell, and I was informed by Rabin that Corenthal's firm was about to take over.

27. I don't recall anything of interest (or indeed anything at all) in the collection of Attorney Emails, except for the discovery that Sidell had secretly tape-recorded his termination meeting. I am confident that I learned nothing of any importance in the case other than of the existence of this tape, which had been concealed from our client.

28. On January 18, 2008, as part of the general production of requested documents, the Attorney Emails were then produced to Sidell's attorney along with other emails, not sent to an attorney, which were the emails in which, immediately after his termination, Sidell stole massive amounts of highly valuable company data. As has already been made clear through extensive telephonic hearings and submissions in the arbitration, counsel did not "redact" anything from the emails.

29. We had sought to produce these materials in advance of January, but we could not do so because Sidell's counsel was slow to agree to a protective order. In fact, after weeks of discussions, Sidell eventually refused to agree to the proposed

9

confidentiality agreement, so that the arbitrator herself had to enter a protective order, which she did on January 18. The document production followed immediately. It is important to understand that as part of this document production, we were producing copies of the same emails in which Sidell illegally sent himself our customer lists, and other things, and it was critical that we not give them these sensitive documents "in the clear" without obligation of confidentiality.

30. After the emails were produced, Sidell's then-attorney raised concerns about the Attorney Emails with the arbitrator. In February 2008, at a conference call, we learned for the first time of the existence of post-termination-date emails among the Attorney Emails. As soon as we discovered the existence of such emails in the mix, I immediately agreed to return ***all*** copies of those emails to Sidell's attorney, and to delete any electronic copies so that we would have no danger of access to them. This we promptly did.

31. That should have been the end of the matter, but Sidell has proven to be intent on making the largest possible issue about this. He has, accordingly, raised it with our arbitrator, and the entire issue is the subject of pending cross-motions for sanctions in the Arbitration. SSI seeks to Sanction Sidell for violating the protective order by intentionally using the emails and other discovery materials outside of the Arbitration, and Sidell seeks to sanction SSI and this law firm, for the identical things raised in this motion. A copy of Sidell's motion in the arbitration is attached as Exhibit F.

32. It is notable that Sidell filed his disqualification motion in response to the sanctions motion pending against them. On June 13, 2008, the arbitrator issued an order authorizing respondents to file a motion for sanctions for Sidell's violation of the

arbitrator's protective order. Sidell then warned that if respondents were going to seek sanctions, he would in turn seek sanctions and to disqualify counsel – thereby demonstrating that this motion is being made for tactical reasons. A copy of the Hurwitz Sagarin firm's June 19, 2008 letter to Arbitrator Miller is attached as Exhibit. G.

33. This duplication of effort points out a fundamental problem with this motion: With all due respect, this motion should be decided, if at all, by Arbitrator Miller, and not by this Court.

34. The instant dispute is among the disputes that are subject to mandatory arbitration – on July 23 we filed a motion to compel arbitration of this action, and the instant motion to disqualify ought not be decided by this Court at all, but instead should be decided (if not first withdrawn) by Arbitrator Miller, who is already in possession of the same motion in the arbitration. The conduct complained of arises 100% from the conduct of the Arbitration, and much of that conduct was personally and directly supervised by Arbitrator Miller. Not only that, the filing of this action was itself a violation of the Arbitrator's Protective Order. Additionally, the entire subject of this action concerns Sidell's employment and termination and his illegal conduct immediately following his termination, all of which is covered by Sidell's employment agreement and its mandatory arbitration clause.

WHEREFORE, I would ask that this Court: (1) send this motion to the Arbitrator for decision, along with the rest of this case; or alternatively, (2) deny this motion and stay the case; or (3) stay this motion and this case pending resolution of the same issues in the arbitration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 31st day of July 2008 in New York, New York.

> /s/ John K. Crossman
> John K. Crossman

## CERTIFICATE OF SERVICE

I hereby certify that, on July 31, 2008, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access the foregoing through the Court's system.

/s/ John K. Crossman
John K. Crossman (ct25518)